VAN METER v. MITCHEL. See Cases Nos. 16,865 and 16,865a.

VAN METER (RICHARD v.). See Case No. 11,763.

---

## Case No. 16,864.

### VAN. METRE v. MITCHELL.

[See Case No. 16,865.]

---

## Case No. 16,865.

### VAN METRE v. MITCHELL.

[2 Wall. Jr., 311;[1] 7 Pa. Law J. 115; 4 Pa. Law J. 111.]

Circuit Court, W. D. Pennsylvania. Oct., 1853.

**FUGITIVE SLAVES—"HARBOURING" AND "CONCEALING"—ACTION OF DEBT FOR PENALTY.**

1. A law of congress enacts, that if any person shall harbour or conceal a fugitive from labour after notice that he or she is so, such person shall forfeit and pay $500 to be recovered by action of debt; saving moreover to the owner of such fugitive a right of action on account of the injuries, &c.

2. "Notice" here means knowledge, and "harbouring" means entertaining or sheltering a fugitive with the purpose of encouraging him in his desertion of his master; with the purpose to further his escape, and to impede and frustrate the master's reclamation of him. "Harbouring" is not here synonymous with "concealing" used in the same phrase with it, and there may be harbouring without any concealment.

3. Under this act, if the plaintiff sues in debt for the penalty of $500, which it gives for illegally harbouring and concealing, he may recover it upon proof of such harbouring or conceal-

[1] [Reported by John William Wallace, Jr., Esq.]

ment, irrespectively of any proof of actual damage to himself. But if he brings case "on account of the injuries," for which the act saves a right of action, he can recover only to the amount of actual damage, which he shows he has suffered.

[Cited in Oliver v. Weakley, Case No. 10,502.]

4. The court makes some remarks upon conscience, and declares perverse conscience to be no excuse for violating the laws of the land.

The constitution of the United States declares (article 4, § 3) that "no person held to service or labour in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation thereof, be discharged from such labour or service, but shall be delivered up on claim of the party to whom such service or labour may be due"; and a law of congress (February 12th, 1793, § 3 [1 Stat. 302]) passed to give effect to the provision of the constitution, enacts that when a person held to labour in any one of the United States, shall escape into any other of them, the person to whom such labour is due, or his agent, may seize or arrest him or her. It then prescribes a mode in which the reclamation is to be made, and enacts (section 4) that any person who shall knowingly and willingly obstruct or hinder such claimant in so seizing or arresting such fugitive, or shall rescue the fugitive when so arrested, or shall harbour or conceal such person after notice, that he or she was a fugitive from labour, shall, for either of the said offences, forfeit and pay the sum of $500 to be recovered by action of debt; saving moreover to the person claiming such labour or service his right of action, for or on account of the said injuries, or either of them. Under this statute two suits of different plaintiffs and defendants were tried in this circuit; one, some time since, of debt for the penalty of $500; the other, some terms ago; now tried a second time, the jury not having agreed on the former trial, an action on the case, on account of the injuries for which the last clause above quoted saves a right of action. Both cases and all three trials are reported here in connection. In the first case (Van Metre v. Mitchell) the negro Jared and another negro ran away from their master in Virginia, and came without stopping to the defendant Mitchell, in the town of Indiana, and county of that name, in Pennsylvania. Why they made their way to that place, or by whom they were directed to make application to the defendant, did not appear. But there, as in a few other parts of Pennsylvania, it was matter of common knowledge—though not perhaps capable of the clearest proof—that fanatics, "friends of humanity," were banded together under professions of conscience and philanthropy, and vows of propagandism to disregard the constitution and laws of the country, which secure to our Southern citizens a right to follow and reclaim their runaway slaves. A regularly organized association existed there, as in some other places, to entice negroes from their owners, and to aid them in escaping to the North. And there was a good deal of evidence to prove the connection

of the defendant with these persons. He appeared, if the evidence against him was true, to be a "philanthropist" by distinction, "a Friend of the Black Man." He discoursed intemperately against Southern planters as kidnappers, dealers in human flesh, monsters in men's form, and emissaries of hell. When a Southern planter came to Indiana to see if his slaves were there, Mitchell gave out to black people that "Indians were abroad," and paid the negroes in his employ their wages forthwith. When requested by a supposed agent of an owner for leave to visit his farm, leave was granted only on condition that he would not molest any man of colour upon it. He cautioned persons—such supposed agents—to be careful how they interfered with any negroes in Indiana, as they were armed, had guns and knives, and were able to take care of themselves, and most likely would fight. When one of them was arrested, and the defendant was asked about the others, and if they had best leave the place, he said that they had been apprised of their danger that evening, and were safe: that they were safe where they were, being armed. On one occasion he had a meeting of "Friends of the Black Man," in his house, a runaway negro being secreted in a back room; and a committee was appointed to protect and counsel the fugitives, and to have them paid their wages whenever necessary. When Jared and his companions arrived at Indiana, the defendant sent them with a letter to his tenant residing on his farm, about nine miles from town. They were directed to take possession of a vacant house on the defendant's farm, and were furnished with bedding, cooking utensils, grain, a cow, and axes. They were employed by the defendant to labour on his farm in making fences and otherwise, and also hired themselves to work for the neighbours. The defendant gave them money with which they bought ammunition and gun caps, and they had guns and dirks. They remained in the defendant's house in this way about four months; and the defendant well knew that they were fugitive slaves, and that Van Metre, the plaintiff, owned them. But no notice, that is to say no formal or specific notice, was ever given by the plaintiff to the defendant of that fact. It was well known to people in the town of Indiana, and in the neighborhood of it, that these slaves were on Mitchell's farm; and except that he once asked a partner of his, who had a saw mill some distance from town, if he could not find employment for the negroes at this mill, alleging as a motive, "that they would be out of the way if they were there"—there was no evidence that Mitchell desired to conceal their place of retreat, or made any secret about it. Two counts of the declaration charged the defendant with "harbouring and concealing;" two others with "harbouring."

For the defendant.

On the two counts which allege "harbouring and concealing," there can be no recovery. Admitting, here, for the sake of argument, that

there has been a "harbouring," there was no "concealing" with it. The proof shows rather an avowed, concerted and systematic defiance of law. Certainly whatever was done was without concealment. If there was a previous conspiracy to make a general and public resistance to the law, that is treason, and the offence is to be proceeded with under a different statute and with a different penalty. Then as to the next two counts which allege "harbouring" only, Dr. Webster, whose Dictionary is at least authority to show how words are used in America, gives the word "secrete" as a definition of the word "harbour." The act of congress, itself, seems to use "conceal" as synonymous with "harbouring," or at least as explanatory of it. The language is not, shall "either conceal or harbour." Bouvier, in his American Law Dictionary, defines "harbour" "to receive clandestinely and without lawful authority a person for the purpose of concealing him; so that another, having a right to the lawful custody of such person shall be deprived of the same." There must, then, be a reception "clandestinely;" that is, "secretly, privately; in private, in secret" (Dr. Johnson); and such reception must have both a certain purpose and a certain result.

II. There was no notice here. If the omission referred to of the word "either," is thought unimportant because the language of the act is precise, certainly the use of "notice" instead of "knowledge" is important. In law, "knowledge" is not "notice." This has been decided in regard to an indorser.

III. The whole legislation on the subject of slavery is in derogation of human liberty. It is against the spirit of the common law. Slavery—that horrid inheritance fastened upon our country by the rapacity and oppression of our French and British ancestry—is an institution local merely. Pennsylvania had scarcely roused herself to independence before she made her great "Act" for its gradual abolition and proclaimed in memorable words her deep sense of its sin and shame.[2]

[2] See preamble to "An Act of 1st March, 1780, for the gradual abolition of slavery," as follows: "I. When we contemplate our abhorrence of that condition, to which the arms and tyranny of Great Britain were exerted to reduce us, when we look back on the variety of dangers to which we have been exposed, and how miraculously our wants in many instances have been supplied and our deliverances wrought, when even hope and human fortitude have become unequal to the conflict, we are unavoidably led to a serious and grateful sense of the manifold blessings which we have undeservedly received from the hand of that Being, from whom every good and perfect gift cometh. Impressed with these ideas, we conceive that it is our duty, and we rejoice that it is in our power to extend a portion of that freedom to others which hath been extended to us, and release from that state of thraldom, to which we ourselves were tyrannically doomed, and from which we have now every prospect of being delivered. It is not for us to inquire why, in the creation of mankind, the inhabitants of the several parts of the earth were distinguished by a difference in feature or complexion. It is sufficient to know that all are the work of an Al-

This court will not strain language to remand that captive who has sought refuge on its soil, nor help again to rivet on his poor limbs the manacles that have once fallen to the ground. It will not strain language to harden the heart of humanity, nor to offend the scrupulous, perhaps the over-sensitive conscience which teaches our weaker brethren that slavery is sin.

GRIER, Circuit Justice (charging jury). [3] [The plaintiff in this case claims to recover from the defendant, the sum of $500, being the penalty given by the 4th section of the act of congress of the 12th of February, 1793, against persons who "harbour or conceal fugitives from labour." The declaration avers: 1st, that, by the laws of Virginia, a certain person named Jared, was held to service and labour by the plaintiff; 2nd, that Jared escaped into the commonwealth of Pennsylvania; and, 3rd, that the defendant, with notice or knowledge of these facts, did harbour and conceal the said Jared, contrary to the act of congress in such case made and provided, and thereby became liable to pay the sum of $500, the penalty inflicted for such offence. A third and fourth count in the declaration charged the defendant with harbouring only, without the charge of con-

mighty hand. We find, in the distribution of the human species, that the most fertile, as well as the most barren parts of the earth are inhabited by men of complexions different from ours and from each other; from whence we may reasonably, as well as religiously infer, that He, who placed them in their various situations, hath extended equally his care and protection to them all, and that it becometh us not to counteract his mercies. We esteem it a peculiar blessing granted to us, that we are enabled this day to add one more step to universal civilization, by removing, as much as possible, the sorrows of those, who have lived in undeserved bondage, and from which, by the assumed authority of the kings of Great Britain, no effectual, legal relief could be obtained. Weaned, by a long course of experience, from those narrow prejudices and partialities we had imbibed, we find our hearts enlarged with kindness and benevolence towards men of all conditions and nations; and we conceive ourselves at this particular period extraordinarily called upon, by the blessings which we have received, to manifest the sincerity of our profession, and to give a substantial proof of our gratitude. II. And whereas the condition of those persons, who have heretofore been denominated negro and mulatto slaves, has been attended with circumstances, which not only deprived them of the common blessings that they were by nature entitled to, but has cast them into the deepest afflictions, by an unnatural separation and sale of husband and wife from each other and from their children, an injury, the greatness of which can only be conceived by supposing that we were in the same unhappy case. In justice, therefore, to persons so unhappily circumstanced and who, having no prospect before them whereon they may rest their sorrows and their hopes, have no reasonable inducement to render their service to society, which they otherwise might, and also in grateful commemoration of our own happy deliverance from that state of unconditional submission, to which we were doomed by the tyranny of Britain."

[3] [From 7 Pa. Law J. 115.]

cealing. The allegations the defendant by his plea has denied, and they constitute the issues you are now sworn to try.

[To men of your intelligence, it is perhaps unnecessary to remark, that in order to discharge the duty you have sworn to perform, of rendering a true verdict on the issues presented to you, the law of the land as stated to you by the court, and applied by you to the facts of the case. constitute the only elements of such a verdict. No theories or opinions which you or we may entertain with regard to liberty and human rights, or the policy or justice of a system of domestic slavery, can have place on the bench or in the jury box. We dare not substitute our convictions or opinions. however honestly entertained. for the law of the land.

[The extradition of criminals or slaves, escaping from one country to another, has generally been considered as a matter of comity and not of right; and the common law and law of nations which refuse to deliver up persons guilty of mere political offences, most probably have borrowed this principle from the Jewish Code (Deut. xxiii.. 15): "Thou shalt not deliver unto his master the servant which has escaped from his master unto thee," &c. The institutions of the Jews, while they tolerated slavery, and would not permit the harbouring or concealing of the slave of one Jew. by another, nevertheless forbade their extradition when they escaped into Judea, from a Gentile or foreign nation. And therein our own laws are assimilated to theirs. While we would not deliver up slaves escaping from a foreign nation, the people of these United States, as one people, united under a common government, have bound themselves by the great charter of their Union, to deliver up slaves escaping from one state to another. "Whatever may be our private opinions," says Chief Justice Tilghman, "on the subject of slavery, it is well known, that our Southern brethren would not have consented to become parties to a constitution, under which the United States have enjoyed so much prosperity, unless their property in slaves had been secured. This constitution has been adopted by the free consent of the people of Pennsylvania. and it is the duty of every man to give it a fair and candid construction and carry it into full force and effect."

[The provision of the constitution (article 4, § 3) is as follows: "No person held to service or labour in one state under the laws thereof, escaping into another, shall in consequence of any law or regulation thereof, be discharged from such service or labour, but shall be delivered up on claim of the party to whom such service or labour may be due." It declares, also (article 6, § 2), "that this constitution and the laws of the United States made in pursuance thereof, shall be the supreme law of the land, and the judges in every state. shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." By virtue of this clause of the constitution the master might have pursued and arrested his fugitive slave in another state, he might use as much force as was necessary for his reclamation, he might bind and secure him so as to prevent a second escape. But as the exercise of such power without some evidence of legal authority might lead to opposition and outrage, and the master, in the exercise of his legal rights, might be obstructed and hindered, it became necessary for congress to establish some mode by which the master might have the form and support of legal process, and persons guilty of improper interference with his rights might be punished. For this purpose the act of congress of 12th February, 1793, was passed. By the third section of this act, the master or his agent is empowered to seize and arrest the fugitive and take him before a judge or a magistrate. and. having made proof of his ownership, obtain a certificate which should serve as a legal warrant for removing the fugitive. The fourth section describes four different offences against the master. which were made liable to be punished with a penalty of $500: 1st, knowingly and wilfully obstructing the claimant in seizing or arresting the fugitive; 2d, rescuing the fugitive when so arrested; 3d, harbouring; and, 4th, concealing such person after notice that he is a fugitive from labour. Two counts of the plaintiff's declaration charge the defendant with harbouring and concealing; two others, with harbouring only. What will constitute the offence by which this penalty is incurred, it will be the province of the court to instruct you, and yours to decide whether the testimony establishes the defendant's guilt. I may here remark, that counsel. in the course of their argument, have referred to an act of assembly of Pennsylvania, passed at the last session, for the purpose, as it was affirmed, of encouraging mobs to rescue fugitive slaves, and to resist their masters in their endeavors to reclaim them; for the honour of the state I venture to assert, that the aim and object of this act must have been misrepresented by those who characterize its provisions. But one thing is certain, that no possible legislation which Pennsylvania may see fit to make on this subject, can have the effect of securing from punishment, those who may incur the penalty prescribed by this act of congress. You will therefore inquire: 1st, whether Jared, the alleged fugitive, was held to labour. or in other words was a slave by the laws of Virginia; 2d, was the plaintiff the party to whom such service or labour was due? 3d, had the slave Jared escaped into Pennsylvania? and, 4th, was he harboured or concealed by the defendant. after notice that he was a fugitive from labour? The first three propositions are not contested, and the case will depend on the sufficiency of the evidence to establish the fourth. In the construction of this portion of the act two ques-

tions obviously present themselves: 1st, what is meant by "notice"; and, 2d, what constitutes "harbouring."

[On the first point the court has been relieved from much difficulty, by a late case tried before Mr. Justice McLean in Ohio, and which has been affirmed in the supreme court of the United States. See Jones v. Van Zandt [Case No. 7,501], 5 How. [46 U. S.] 216.] [3]

The meaning of the word "notice," as used in this act, has been settled, and is not now open for discussion. It means knowledge. A specific notice, either written or parol, need not be given. It is enough if the defendant knows that the person he is harbouring is a fugitive from labour. Jones v. Van Zandt, 5 How. [46 U. S.] 215–225.

[The important question in the case, therefore, and which will require your most careful examination, is whether the conduct of the defendant towards Jared comes within the category of "harbouring or concealing."] [3]

II. The word "harbour" is defined by Dr. Johnson and other lexicographers, "to entertain," "to permit to reside," "to shelter," "to secure"; and Dr. Webster adds, "to secrete." It has various shades of meaning not exactly definded by any synonyme. Mr. Bouvier's definition cited and relied on at the bar, is quoted in the opinion of the supreme court already referred to, but without the intention of affirming either the authority of Mr. Bouvier's Law Dictionary, or the correctness of the definition. For although the word may be used in the complete meaning there given to it, it does not follow that all these conditions are necessary elements in its definition. "Receiving and entertaining a person clandestinely, and for the purpose of concealment," may well be called "harbouring," as the word is sometimes used. Yet one may harbour without concealing. He may afford entertainment, lodging and shelter to vagabonds, gamblers and thieves, without a purpose or attempt at concealment, and yet it may be correctly affirmed of him, that he "harbours" them.

The act of congress, by using the terms "harbour or conceal," assumed, I think, that the terms are not synonymous, and that there might be a harbouring without concealment. The act seems to be drawn with great care and accuracy, and bears no marks of that slovenly diction which sometimes characterizes acts of assembly, where numerous synonymes are heaped together, and words are multiplied only to increase confusion and obscurity. But neither in legal use, nor in common parlance, is the word "harbour" precisely defined by the words "entertain" or "shelter," given by Dr. Johnson as two of its meanings. It implies impropriety in the conduct of the person giving the entertainment or shelter in consequence of some imputations on the character of the person who receives it. An innkeeper is said to entertain

travellers and strangers, not to harbour them; but may be accused of harbouring vagabonds, deserters, fugitives or thieves; persons whom he ought not to entertain.

The act of congress does not intend to make common charity a crime, or treat that man as guilty of an offence against his neighbour, who merely furnishes food, lodging or raiment to the hungry, weary or naked wanderer, though he be an apprentice or a slave. On the contrary, it contemplates not only an escape of the slave, but the intention of the master to reclaim him. It points out the mode in which this reclamation is to be made, and it is for an unlawful interference or hindrance of this right of reclamation, secured to the master by the constitution and laws, that this action is given.

The harbouring made criminal by this act, then, requires some other ingredient besides a mere kindness, or charity rendered to the fugitive. The intention or purpose which accompanies the act, must be to encourage the fugitive in his desertion of his master, to further his escape, and impede and frustrate his reclamation. "The act must evince an intention to elude the vigilance of the master, and be calculated to obtain the object." Jones v. Van Zandt [Case No. 7,501].

[3] [It will be your duty, gentlemen, to apply these principles to the evidence in the case, and find your verdict accordingly; you will inquire first, whether the defendant gave entertainment and shelter to the fugitive Jared. The evidence on this point is, that Jared and another escaped from their master in Virginia, and came, without stopping on the way, to the defendant in the town of Indiana, about the last of April, 1845; but why they made their way to that place, or by whom they were directed to make application to the defendant, does not appear; that the defendant sent them with a letter to his tenant residing on his farm, some nine miles from Indiana; that they were directed to take possession of a vacant house on the land of the defendant; that he furnished them with bedding, cooking utensils, grain, a cow and axes; that they were employed to labour for him on his land, in making fences, or otherwise, and hired themselves to work for other neighbors; that they remained in the defendant's house till September; and that the defendant well knew they were fugitive slaves, and to whom they belonged. These facts, if believed, would prove that defendant gave the fugitive Jared shelter and entertainment with full knowledge that he was a fugitive from labour. Secondly, was this done for the purpose of concealing him from the search of his master or for furthering his escape, and impeding and obstructing the master in his recapture? On this point you will form your judgment, both from the declarations and actions of the defendant; a man is presumed to intend what is the natural and necessary result of his

actions. It appears from the testimony, that the fact was notorious to the people of the town of Indiana, and the neighborhood, that these slaves were on the defendant's farm, and that he himself made no secret of it. On the other hand, one of the witnesses, a partner of defendant, was asked by him if he could not find employment for the negroes at his saw mill, alleging as a reason, "that they would be out of the way there." That is all the evidence of a desire to conceal their place of retreat from the public, that I recollect.] [3]

I can imagine a harbouring of slaves, without any affectation of concealment, which might be as injurious to the master, and as effective in promoting the escape of the slave, and frustrating the vigilance of the master. If a man should furnish a house in the woods as a rendezvous for fugitive slaves. encourage them in remaining there. and in enticing others to join them, should countenance and assist them with the means of resistance to their recaption, and furnish them information of pursuit. in order to further their escape, or prepare them to resist; such a harbouring might be as injurious to the master, and is as fully within the meaning of the statute, as if the fugitives had been concealed. Such protection might be made more efficacious in enabling them to elude the vigilance of their master, than any attempt to conceal them. What amounts to concealment, also, may depend much on circumstances. It does not necessarily require that the subject of it be secreted in a garret or a cellar, a barn or a covered wagon. The highways of a remote and uncultivated county like Indiana may be better places of concealment than the by-ways of many other places; and the limits of the whole county as good a place to secrete fugitives from a distant state. as any that may be imagined. especially if the fugitives have a committee of sympathisers to watch over their interests, and give them warning of the approach of danger.

But assuming that the evidence is not sufficient to establish the charge of harbouring and concealing. Inquire, then, whether shelter and entertainment was afforded to the fugitives, for the purpose and with the effect of encouraging them in the desertion of their master, and furthering their escape, and to impede or frustrate their arrest.

Look at the conduct and declarations of the defendant. Does he furnish a place of rendezvous or a harbour, not only for the fugitive in question, but for all whom they can entice to leave their masters? Is he the confidant of their schemes for rescuing other slaves, or enticing them to escape? and when they have succeeded, do the new fugitives come immediately to the defendant and proceed to his farm, the bearer of letters from the defendant to his tenant? When he is requested by a supposed agent of the owners to be permitted to see the fugitives on his farm, does he make it a condition of his compliance that he shall not molest them? When there is danger of their recaption, does he have information conveyed to them that there are "Indians abroad?" a slang- phrase, well understood in the country as a warning to be on their guard. and make their escape. Does he give them money to buy ammunition or gun caps? Does he express his confidence that they are sufficiently armed. and able to resist successfully any force sent to arrest them; that they have a gun, dirk and axes, and know how to use them? When an arrest had been made of one of them. and he is inquired of, as to the safety of the others. does he say, "that they had been apprised of their danger that evening. and were safe—that they were safe where they were," and well armed. and therefore there was no reason for concealment or flight? Does he call a meeting at his own house of persons friendly to the fugitives. and have one of them in his back room? At this meeting is a committee appointed to protect and counsel the fugitives; to settle up their wages, that they may escape if threatened with pursuit? Is the defendant, on the next day, engaged in settling with the fugitives through their committee, stating, "there were Indians abroad the night before, and that he would settle up and let them go?"

This mala mens, or fraudulent intent required by the act to constitute illegal harbouring, is not to be measured by the religious or political notions of the accused. or the correctness or perversion of his moral perceptions. Some men of disordered understanding or perverted conscience may conceive it a religious duty to break the law, but the law will not tolerate their excuse. If the defendant was connected with any society for the purpose of assisting fugitives from other states to escape from their masters, and in pursuance of such a scheme, afforded this shelter and protection to the fugitive in question. he would be legally liable to the penalty of this act, however much his conscience, or that of his associates, might approve his conduct. With any opinions of the defendant. you have no concern. He may adopt and entertain, as opinions, whatever folly likes him: and as long as these remain opinions, he will go unpunished. He is on trial for his acts: and if his opinions. ceasing to be speculative, have ended in conduct, let no morbid sympathy—no false respect for pretended "rights of conscience"—prevent either court or jury from judging him justly, without favour as without fear.

"Be careful," says the great casuist Taylor, "that prejudice or passion, fancy or affection, error and illusion, be not mistaken for conscience. Nothing is more usual," he adds, "than to pretend conscience to all the actions of men, which are public. and cannot be concealed. . . . The disobedient refuse to submit to the laws, and they also in many cases pretend conscience"; "and so . . . . dis-

obedience and rebellion are become conscience, in which there is neither knowledge, nor revelation, nor truth, nor charity, nor reason, nor religion." . . . . "What they think is not against conscience, they think or pretend to think it is an effect of conscience; and so their fond persuasions, and fancies are made sacred, and conscience is pretended, and themselves and every man else is abused. . . . . They think that some sacredness or authority passes upon their passion or design if they call it conscience." "Conscience," he declares in another place, "is tied to laws." And he distinguishes between the "right or sure conscience,"—which is right reason reduced to practice and conducting moral actions—and "the perverse conscience" which is seated in the fancy or affections, "a heap of irregular principles and irregular defects, and is the same in conscience as deformity is in the body, or peevishness in the affections." "It is not enough," he says, "that the conscience be taught by nature: but it must be taught by God, conducted by reason, made operative by discourse, assisted by choice, instructed by laws and sober principles, and then it is right, and it may be sure."

He specially considers the class of duties where, in seeking guides to a knowledge of what is obligatory on us, "lawyers" are to be preferred to "divines." While declaring that "all the general measures of justice are the laws of God, and therefore cognizable by the ministers of religion," he adds that as "these general measures, like a great river into little streams, are deduced into little rivulets and particularities by the laws and customs, by the sentences and agreements of men, therefore they must slip from the hands of the spiritual man to the prudent and secular. The divine can condemn all injustice, murder, incest, injurious dealing; whether all homicide be murder, all marriage of kindred be incest, or taking that which another man possessed be injustice, must be determined by laws and the learned in them." Ductor Dubitantium, bk. 1, c. 1, rule 3, §§ 1, 2;- Id. c. 11, rule 1; Id. c. 1, rule 7, § 13; Id. c. 11, rule 4, § 8; Id. c. 4, rule 10, § 85.

If you believe from the testimony, that the entertainment and shelter given to the fugitives were but an exercise of the common principles of humanity, without any intention of encouraging the escape of the fugitive, or impeding or frustrating his recaption or reclamation by his master, or without any act calculated to have that effect, you will find for the defendant.

If, on the contrary, you believe he has afforded shelter and entertainment to the fugitive, to further his escape, and enable him to elude the vigilance of his master, and that his acts were calculated to effect that object, you will find for the plaintiff $500.

Verdict accordingly.

[For a motion in arrest of judgment, see Case No. 16,865a.]